UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>TIRSO MONTES | No. 18 CR 465-2<br><br>Honorable Matthew F. Kennelly |

**GOVERNMENT'S POSITION PAPER AS TO SENTENCING FACTORS**

The United States of America, through JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, submits its sentencing memorandum as to defendant Tirso Montes. For the reasons set forth in more detail below, the government requests that the Court impose a sentence within the advisory Guidelines range of 92 to 115 months' imprisonment and a three-year term of supervised release. Defendant's conduct in this case – participating in the making of extortionate calls – and his criminal history and background, all demonstrate that a Guidelines sentence is sufficient and not more than necessary to satisfy the goals of criminal sentencing.

**I.    BACKGROUND AND OFFENSE CONDUCT**

As set forth in his plea agreement, defendant has pleaded guilty to making, transmitting, or causing to be transmitted extortionate calls that contained a demand for ransom for the release of Individual A, in violation of Title 18, United States Code, Sections 875(a) and 2. Defendant has also stipulated to possessing a firearm by a convicted felon, in violation of Title 18, United States Code, Section 922(g)(1).

### A. Extortion

In the early morning hours of October 30, 2017, Individual B reported to law enforcement that his nephew, Individual A, called him and said that he had been kidnapped, and that the kidnappers sought $100,000 or two kilograms of cocaine as ransom. The calls made to Individual B were initially made from Individual A's phone number. Later calls appeared as coming from a "private number" such that Individual B could not determine the telephone number or numbers calling his phone. Telephone records, including cell site information, call detail records, and location information for Individual B and Individual A's phones confirmed that Individual A's phone was used to contact Individual B with that initial extortionate demand at approximately 8:09 a.m., and calls from co-defendant Jorge Rosario's phone to Individual B (which were disguised as coming from a "private number") began at 8:33 a.m.

Throughout the day on October 30, 2017, defendant participated with the other defendants in making or causing to be made numerous calls to Individual B, during which one or more of the defendants threatened to harm Individual A if ransom was not paid. Those calls were disguised by the caller dialing 67 before Individual B's number was dialed. In addition, all of the defendants communicated with each other, in person and by telephone, regarding the extortion throughout the day.

The calls to Individual B[1] and the communications between defendants included the following:

- At approximately 10:12 a.m., Individual B received a call from Rosario's phone. Individual B told the caller that he was waiting on his brother. The caller told Individual B not to "play games" and Individual B assured him he isn't paying games and that he was "going to make it happen." Individual A then speaks and tells Individual B that "they" were going to kill him. Individual B reassured Individual A that he was getting the money soon. Another co-defendant, whose voice is not recognizable, then told Individual B that Individual B should not call the police and that "your nephew good." Individual B was told he would get a call back.

- At approximately 10:22 a.m., Individual B received a call from Rosario's phone. During that call, the caller asked "Where you at? You at the police station or something?" Individual B told the caller that he was at his brother's workplace, a Coca Cola factory. The caller asked how long they had to wait. Rosario can then be heard saying that it was taking too long.

- At approximately 10:44 a.m., Individual B received a call from Rosario's phone. During that call, Rosario told Individual B that Individual A called another person, Individual C, but that person did not care about Individual A. Rosario said, "He in this jam because of [Individual C], it ain't cause of you."

- At approximately 10:55 a.m., Individual B received a call from Rosario's phone. During that call, Individual B told Rosario that he could only get "44Gs." Rosario responded, "that's all you got right now?" Individual B said that he could also get some cocaine to add to the $44,000. Rosario said, "put the 44 and put the rest to work, and come on come and get him. I'm gonna call you in 5 minutes and tell you where to meet me at." Individual B said that it would take some time to get the cocaine, and Rosario responded, "grab it fast though, grab it as fast as possible, meet me somewhere in K-town area, I'm somewhere in K-Town right now."

---

[1] The government has provided the Court with a DVD containing the recorded calls made to Individual B's phone on October 30, 2017, as an attachment to the courtesy copy of the Government's Position Paper as to Sentencing Factor as to defendant Jorge Rosario.

- At approximately 11:14 a.m., Rosario sent a text message to co-defendant Angelo Quinones, which stated, "Hurry bitch we gotta pick up the money."

- At approximately 11:24 a.m., Individual B received a call from Rosario's phone. During that call, Individual B told Rosario that he had picked up the cocaine, but needed to know where to go with it. Rosario said to stay in K-Town, that he would meet Individual B in the area, and that Individual B should wait for another call in 10 minutes.

- At approximately 11:39 a.m., Individual B received a call from Rosario's phone. During that call, Individual B told Rosario that he was on his way toward K-Town. Rosario told Individual B to get whatever cocaine he had and to meet him in K-Town in 10 minutes. Rosario then put Individual A on the phone. Individual A told Individual B to do this as fast as he could. Individual B then asked how they were going to handle the exchange because Individual B did not want to show up and not get his nephew. Rosario then said, "He's good" and "we gonna let him go."

- At approximately 11:56 a.m., Individual B received a call from Rosario's phone. During that call, Individual B told the caller that he was waiting for "his guy" to go with him because Individual B did not know the callers and did not want to end up in the same situation as his nephew. Rosario then said, "Your nephew, he knows what's up, you give up, you give that shit up and he's good." Individual B said that he was waiting for his ride and Rosario said, "No Police" and "We streets, we streets with this shit."

- At approximately 12:13 p.m., co-defendant Tirso Montes texted Rosario, stating "Wats taking so long." Rosario responded "D we waiting on him ima call em in 10 mins tell him were to meet me pw". Montes responded that it was taking too long and they needed to leave. Rosario responded "We is we good pw nobody lives down stairs."

- At approximately 12:18 p.m., Individual B received a call from Rosario's phone. During that call, Individual B asked where he needed to go. The caller asked where Individual B was and Individual B replied that he was at Armitage and Pulaski. The caller told Individual B to go to the Humboldt Park area of Chicago and he would call Individual B in five minutes.

- At approximately 12:27 p.m., Individual B received a call from Rosario's phone. During that call, Individual B asked where he needed to go. The caller asked what type of car Individual B was driving. Individual B told

4

him he was driving a Cadillac truck. The caller told Individual B to put "everything, all in one bag." Individual B then asked how he was going to get his nephew. The caller said his nephew was "good." The caller said his nephew was "in the crib" and was "good." The caller said Individual B needed to have a little "trust" and that he would send his nephew after they receive the money. Individual B said he didn't want to give them his money and then they "smoke" his nephew. The caller said he wasn't going to "smoke" his nephew. Individual B said "I know how this goes, I'm Mexican, we kidnap motherfuckers too." The callers then agreed to let Individual B speak to his nephew in another call.

- At approximately 12:32 p.m., Individual B received a call from co-defendant Thomas Lee's phone, during which call Individual B spoke with Individual A and another caller, possibly Lee. Individual A told Individual B that Individual B needed to "take the chance, man." Individual B asked why he should take a chance and then they would "smoke" Individual A. One of the callers told Individual B, "he safe right here, we ain't put no hands on him, we just want that money." The caller said, "we don't want no police." Individual B said he wasn't working with the police and that he had kidnapped people before, "I know how this go." Individual A told Individual B, "they not gonna hurt me." The caller said, "Listen, listen, listen, once your nephew's gone my nigga I'll give up his phone back so he can call you, so you can come and pick him…wherever you want to meet at." Individual B said he would talk to his "guy" and they should call him back.

- At approximately 12:38 p.m., Individual B received a call from Rosario's phone. Individual B told the caller that he was waiting for approval from the family to give over the money. The caller asked if Individual B was calling the police. Individual B said he was not calling the police. Individual B told the caller, "I got this paper…you gonna get paid." The caller said, "Once we get paid, he gets let loose. You know how this shit goes." Individual B said, "I've gotten money and haven't let motherfuckers loose." The callers can be heard talking about putting Individual A in the car and taking Individual A to Individual B. The caller says, "the streets say you the police." Individual B said, "you want this money, I got it."

- At approximately 12:44 p.m., Individual B received a call from co-defendant Lee's phone. Individual A said, "Please please." The caller then took the phone and stated, "Listen to me real quick, I only got two options right now, either I get the money or…" At that point, the callers became inaudible.

5

- At approximately 12:47 p.m., Individual B received a call from co-defendant Lee's phone. During the call, Individual A told Individual B that they were going to drop him five blocks away, "they already untied me, they charged my phone, they just want the money and [Individual C], that's it. ... I'm untied." When Individual B said he couldn't just release the money, Individual A said, "then they are going to kill me ... they already tried to cut my finger."

- At approximately 12:56 p.m., Individual B received a call from Rosario's phone. During the call, Rosario told Individual B, "Get the money together, you gonna jump in with us, once you jump in with us, we gonna take you to Juju [Individual A]." Rosario went on to say, "I'mma meet you somewhere, you gonna put the money in one car, we gonna let, you gonna be on the phone with Juju, Juju, I'm bringing him out the crib right now, they bringing him out the crib right now.... When we do the deal, he gonna be there, everything's gonna be good." Individual B and the caller agreed to meet at a taco place at Chicago and Grand in Chicago.

- At approximately 1:26 p.m., defendant texted Rosario, asking what the plan was. Rosario responded, "This nikka phone off make him call the Mexican who owns the restaurant." Montes replied that the phone was off. Rosario responded, "Tell em who he gone call or we gone turn em in to black D for a brick."

- At approximately 1:28 p.m., defendant sent Rosario a text message, saying that he was about to let Individual A go and Rosario responded, "We aint do all this for nothing we gone get something."

- At approximately 1:46 p.m., Individual B received a call from Lee's phone. During the call, the caller asked Individual B what happened and Individual B explained that his cell phone died and he needed to charge it. The caller stated, "we got your nephew," that they are tired of driving around and want to meet. The caller said, "You need what we have." The callers then said that he was going to call Individual A's mother so she could hear his voice.

- At approximately 1:55 p.m., Rosario sent defendant a text message, saying, "talked to buddy in Mexico he knw Wat it is, he said they gone pay."

- At approximately 2:52 p.m., Quinones sent a text message to Lee that stated, "Stop saying names."

6

- At approximately 3:32 p.m., defendant texted Rosario, "D jump in here so I could close my eyes for a few."

- At approximately 4:19 p.m., a phone number assigned to "Ashley" texted Rosario, "Yu gud." Rosario responded, "I want tjis money so I cud get put up n sleep all day."

- At approximately 5:40 p.m., Individual B received a call from Lee's phone. During the call, Individual B told Individual A that Individual A's mother was taken to a hospital. Individual B said he was getting back on the road. The caller said he would call back to instruct Individual B where to meet.

- At approximately 6:14 p.m., Individual B received a call from Lee's phone. During the call, Rosario can be heard telling Individual B to "Just come down North Avenue" and that they will call back in 20 minutes. A male voice can be heard in the background yelling, "Quit playing games Shorty."

- At 6:26 p.m., Rosario texted a number assigned to "Jenny Ramos," stating "Sopoably he on his way with the money." Ramos responded, "Finally! Hopefully ain't no bullshit. PLEASE BE CAREFUL BABE." Ramos went on, "Be ready for anything my love, you never know.

Based on phone location information received from the service providers pursuant to Court orders, agents were able to determine where the phones making the calls were located. Law enforcement officers and agents conducted a rescue operation at that address at approximately 6:40 p.m. During the rescue operation, law enforcement conducted air surveillance and officers observed that during the rescue, a firearm was thrown from a second floor bedroom onto a roof next door. The firearm was later recovered and determined to be a Glock 21 Gen 4 .45 caliber

7

handgun with serial number YUW134. The firearm was loaded with 12 live .45 caliber rounds.[2]

When they entered the second floor apartment of the residence, officers and agents found Individual A and Quinones in the living room and both were placed into custody. Agents then observed Rosario exiting a bedroom adjacent to the living room and Rosario was placed into custody. The bedroom was observed to have a northbound facing window with no screen. This window was later determined to be the same window from which air surveillance had observed the firearm being thrown during the rescue operation. Agents also found Lee and defendant in a second bedroom adjacent to the living room. Lee and Montes were placed into custody. A photograph showing defendant holding a firearm toward Individual A was later found on co-defendant Lee's cell phone.

### B. Possession of a Firearm by a Convicted Felon

Defendant has also stipulated to previously having been convicted of a crime punishable by a term of imprisonment exceeding one year and knowingly possessing in and affecting interstate commerce a firearm, namely, a Savage Arms Inc., model Mark II, .22LR caliber bolt-action rifle, bearing serial number 2308370; a Savage Arms Inc., model 12, .308 Winchester caliber bolt-action rifle, bearing serial number H027849; and a Sturm, Ruger and Co., model 10/22, .22 LR caliber semiautomatic

---

[2] The government has provided the Court with the video of the air surveillance as an attachment to the courtesy copy of the Government's Position Paper as to Sentencing Factor as to defendant Jorge Rosario.

rifle, bearing serial number 355-02090, which firearms had traveled in interstate and foreign commerce prior to defendant's possession of the firearms, in violation of Title 18, United States Code, Section 922(g)(1).

Specifically, on January 25, 2018, months after the committing the extortion offense in October 2017, defendant agreed to sell three rifles in his possession for $1300 to a customer of Justin Acevedo (a co-defendant in 18 CR 509). Defendant understood that Acevedo was brokering the sale to this customer. Unbeknownst to defendant and to Acevedo, the customer was a confidential source ("CS") who was working with undercover law enforcement officers ("UCs"). Defendant agreed to meet with the CS and the UCs so they could inspect the rifles prior to the sale.

That same day, at approximately 4:38 p.m., defendant received a call from Acevedo who told defendant that he had the money to purchase the firearms. During the course of subsequent calls, defendant and Acevedo arranged to meet at a Home Depot parking lot, located at 1919 North Cicero Avenue, in Chicago, Illinois.

At approximately 5:54 p.m., Acevedo and the CS arrived at the Home Depot parking lot and approached defendant. Defendant asked if the CS was police. Shortly afterwards, the UCs arrived, and defendant approached the UC vehicle and said that he wanted to move to a nearby Walmart parking lot.

At approximately 6:01 p.m., defendant, Acevedo, the CS, and the UCs a drove from the Home Depot parking lot to a Walmart parking lot located at 4650 West North Avenue, in Chicago, Illinois. When they arrived, defendant, Acevedo, the CS,

9

and the UCs all exited their respective cars and walked to the rear of the UC vehicle. Defendant asked a UC, "y'all ain't the police, is y'all?" Defendant then retrieved two long gun cases from the back seat of his Honda CRV and placed them in the back of the UC vehicle. Defendant knew that the following were in the gun cases: a Savage Arms, Mark II .22 caliber rifle bearing serial number 2308370; a Ruger, model 10/22, .22 caliber rifle bearing serial number 355-02090; a Savage Arms, model 12, 308 caliber rifle bearing serial number H927849; two black suppressors; one black Osprey 10-40x50 scope; a black trigger mechanism; and a .22 caliber extended magazine.

Defendant also knew that Acevedo then sold the UCs the rifles. Shortly afterwards, Acevedo returned to defendant's car and gave him $1,300, which defendant understood to be his proceeds from the sale. Defendant then retrieved several boxes of assorted ammunition, including approximately 1,500 .22 caliber rounds of Remington ammunition; approximately 400 .22 caliber rounds of Speer ammunition; and approximately 240 7.62 caliber rounds of ammunition from the rear backseat of the Honda CRV and placed the boxes of ammunition in the UC vehicle.

Two of the firearms sold to the UCs in the January 25, 2018 sale were stolen: the Savage Arms, Mark II .22 caliber rifle bearing serial number 2308370 and the Savage Arms, model 12, 308 caliber rifle bearing serial number H927849. In addition, prior to his possession of the firearms on January 25, 2018, defendant knew that he had been convicted of a crime punishable by a term of imprisonment exceeding one

year, as he served a six-year sentence in the Illinois Department of Corrections (IDOC) for a 2004 conviction.

## II. GUIDELINE CALCULATIONS

The government does not have any objections to the Presentence Investigation Report ("PSR"). The government agrees that the total offense level after acceptance of responsibility is 26. Based on that offense level and a criminal history category of IV, the appropriate Guidelines range is 92 to 115 months' imprisonment and a term of supervised release of one to three years.

## III. THE FACTORS SET FORTH IN 18 USC § 3553(a) WARRANT A SENTENCE WITHIN THE GUIDELINES RANGE

The advisory Guidelines range is the starting point and initial benchmark for determining the appropriate sentence for defendant. *United States v. McLaughlin*, 760 F.3d 699, 708 (7th Cir. 2014). Although a sentence within the Guidelines range is presumptively reasonable, *United States v. Cano-Rodriguez*, 552 F.3d 637, 639 (7th Cir. 2009), the court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining an appropriate sentence. Further, sentences within the advisory Guidelines range help avoid unwarranted sentencing disparities. *See United States v. Reyes-Medina*, 683 F.3d 837, 841 (7th Cir. 2012) (a sentence within the advisory guidelines range necessarily complies with 18 U.S.C. § 3553(a)(6)); *see also United States v. Orsburn*, 525 F.3d 543, 547 (7th Cir. 2008) (courts avoid sentencing disparities by starting with the advisory guidelines range and making adjustments at the margin). In this case a sentence within the advisory Guidelines range is

11

sufficient, but not greater than necessary, to reflect the seriousness of defendant's offense, promote respect for the law, provide just punishment for defendant's crime, and afford adequate deterrence.

### C. The Nature and Circumstances of the Offenses

The nature and circumstances of the offenses support a sentence within the appropriately calculated Guidelines range. First, defendant participated in a scheme of extortion of Individual A's uncle, Individual B, seeking $100,000 of ransom (in cash or cocaine) in exchange for the release of Individual A. The numbers from which those calls were made were intentionally blocked by the callers in order to thwart law enforcement. Nevertheless, Individual B took those calls seriously, and alerted law enforcement. Law enforcement responded appropriately, launching a full-scale investigation involving agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives, the Federal Bureau of Investigation and the Department of Homeland Security Investigations and Chicago Police Department officers. Those agents and officers worked throughout the day to locate defendant and his co-defendants, fearing that defendants would seriously harm or even kill Individual A. When Individual A's mother learned of the extortionate demands, she suffered from anxiety and had to be rushed to the hospital.

Based on the photograph found on co-defendant Lee's cell phone, it is clear that defendant possessed a firearm during the time that the extortionate calls were being made. Defendant's possession of a firearm, and the fact that that firearm was in the

12

residence when officers and agents conducted their rescue mission only adds to the increased danger posed by defendant's conduct.

Moreover, at the end of the day, the agents and officers prepared for and executed a rescue mission. That activity involved ATF, FBI, HSI, CPD and the Chicago Fire Department, and also included an air surveillance unit. Beyond the amount of resources that were expended conducting the rescue, the mission could have resulted in serious physical harm to the agents and officers, bystanders as well as to defendant, his co-defendants and to Individual A.

Given all of those circumstances related to the extortion offense – the nature of the calls, the scale of the operation to rescue the purported kidnapped victim, the impact on the purported victim's mother and the possession of the firearm during the commission of the offense – a sentence within the Guidelines range is both appropriate and necessary on that offense alone.

Second, defendant has not only admitted to the extortion that took place on October 30, 2017. In addition, defendant has also stipulated that he provided firearms – including two stolen firearms – to Justin Acevedo, who identified himself during the transactions as a member of a street gang. Defendant confirmed during one of the transactions with the CS that the CS was not "police" because he knew what he was doing was unlawful, and yet he did it anyway. Defendant was also told that the purchasers were "biker mother fuckers." Defendant's possession of the firearms by itself would have been illegal. But defendant did not simply possess the

13

firearms for his own collection or for his protection. Defendant sold and transferred the firearms to people he did not know; defendant did not know why those people wanted the firearms or what they planned to do with the firearms, nor did he seem to care. In a time in Chicago when gun violence is disturbingly common, defendant's actions are that much more serious. Accordingly, defendant's conduct in both offenses are sufficiently serious to merit a serious sentence, which is a term of imprisonment within the appropriately calculated Guidelines range.

### D.     History and Characteristics of the Defendant

Over the course of just a few months, defendant participated in two serious and dangerous offenses – extortion and the sale of firearms – which speaks volumes about his character. Defendant's criminal history further demonstrates his character. He was convicted in April 2004 for attempted first-degree murder of a police officer. For that conviction, he received a sentence of six years imprisonment. In June 2016, four separate cases of burglary, where he was acting as a lookout for someone who had broken into a home. In addition to those convictions, defendant was arrested 22 times as a juvenile and 10 times as an adult, including for domestic battery, criminal damage to property and multiple motor vehicle incidents. That history is indicative of the defendant's inability to abide by the law and, even more troubling, puts other people at risk.

According to Probation, the death of his mother's fiancée appears to have caused defendant to "spiral downward" when he was nine years old, which led

14

defendant to a life as a member of the Maniac Latin Disciples. (PSR ¶¶ 111, 114.) His membership in the MLDs may also explain his involvement in this offense, and his prior criminal offenses arrests. (PSR ¶ 64.) That traumatic event, while mitigating, does not, however, outweigh defendant's conduct such that a below-Guidelines sentence would be appropriate here.

Defendant committed the conduct in these cases when he was 33 years old, which is old enough to know that he was putting himself, his co-defendants, Individual A and law enforcement, and the community in general, in serious danger. These were not the acts of a teenager or someone who was dealing with a recent trauma; rather, as his mother noted to Probation, defendant committed the extortion offense because he needed the money (PSR ¶ 114) and that also appears to have driven him to sell firearms to the UC. Because this offense, like the extortion offense, was so serious, and put so many people at risk, and because there are few mitigating circumstances in defendant's history and character that could mitigate these offenses, a Guidelines sentence is appropriate and necessary.

> **E.     Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment as well as Adequate Deterrence**

The need for defendant's sentence to reflect the seriousness of his offenses is critical here. A Guidelines sentence will address the seriousness of both offenses and promote respect for the law in that it will let defendant know that extortion and the possession and sale of firearms will not be tolerated and will be treated severely.

15

Moreover, a significant period of incarceration is necessary to deter defendant and others from committing similar crimes in the future and to protect the public.

### IV. GOVERNMENT'S POSITION ON SUPERVISED RELEASE

Consistent with Probation's recommendation, the government recommends that the Court impose a term of supervised release of three years. The government agrees with the proposed mandatory, discretionary, and special conditions of supervised release set forth in the PSR as facilitating probation's supervision and easing defendant back into the community.

### V. CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court impose a custodial sentence within the Guidelines range and a three-year term of supervised release with conditions.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

by:

/s/ *Matthew L. Kutcher*
MATTHEW L. KUTCHER
Assistant United States Attorney
219 South Dearborn Street, Fifth Floor
Chicago, Illinois 60604
(312) 469-6132