IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | No. 18 CR 465 |
| v. | ) | Judge Matthew F. Kennelly |
| | ) | |
| | ) | |
| TIRSO MONTES | ) | |

SENTENCING MEMORANDUM

I.     Guideline Calculations in the Presentence Investigation Report.

A.  Criminal History Category – Motion for downward departure of one criminal history point for conviction related to possession of up to 10 grams.

The Presentence Investigation Report (PSR) allocates a total of 7 criminal history points placing him in Guideline category IV (PSR, § 73).  While the PSR correctly calculates the 7 criminal history points, the defense asks the court to downward depart one criminal history point.  This one point is allocated for Mr. Montes's prior conviction for possession of under ten grams of marijuana for which he received a sentence of two days custody (PSR, § 66).

The basis for this departure request is the change in Illinois law that will decriminalize marijuana possession of up to 30 grams effective January 1, 2020.[1]  The people of Illinois determined, after receiving evidence in the legislative process, that possession of under 30 grams of marijuana presents far less harm than previously believed.  Therefore they have

---

[1] See, Cannabis Regulation and Tax Act, HB 1438.

determined that such possession should no longer be a criminal act in Illinois.

The Cannabis Regulation and Tax Act also creates an executive branch process for the expungement of prior convictions for thirty grams or less of marijuana. The people of Illinois have determined that people previously convicted of such conduct, should no longer be burdened by convictions that they have determined to not present the dangers previously believed. In effect by creating a process of expungement, the people of Illinois have made decriminalization of less than 30 grams of marijuana, retroactive.[2]

Mr. Montes's marijuana conviction in 2014 for under 10 grams falls into the class of convictions that will qualify for expungement. For our purposes, the people of Illinois had determined that it no longer represents the level of harm deserving of a crime. Prior to *Booker*, decriminalization of an offense would be a quintessential basis for a downward departure for over representation of criminal history.

### B. Motion for downward departure for three criminal history points related to Attempt Murder for 2002 arrest at age 17 based on the change of Illinois law as to juvenile jurisdiction.

Mr. Montes has a prior conviction for attempt murder for an offense that took place on October 14, 2002 (PSR, § 64). Mr. Montes agrees that the PSR appropriately counts this conviction. Factually, Mr. Montes reports that he was being chased by someone who he did not know was a police officer. He reports that during this chase he pointed a weapon to stop the person from chasing him, but did not fire the weapon.

While this was a serious offense, it is important note that that Mr. Montes was only 17

---

[2] The Cannabis Regulation and Tax Act also creates a process for defendants convicted of 30 to 500 grams of marijuana to motion the court to vacate or expunge such convictions.

years of age on the date of the offense of October 14, 2002 (PSR, § 64). In 2002, the minimum age for criminal offense jurisdiction was age 17. Effective January, 2014, Illinois increased the age of juvenile court jurisdiction from 17 to 18 years of age. *See*, 705 ILCS 405/5-120 (the minimum age to be subject to adult jurisdiction restricted to offenses committed at age 18 and older).[3]

The Illinois legislature determined that children who committed offenses at age 17 required prosecution in the juvenile rehabilitative system to avoid the more punitive and burdens that adult criminal convictions carry because 17 year olds have still developing brains that result in acts that should be considered less culpable actions of adults. The Illinois Juvenile Justice Commission's study "Raising the Age of Juvenile Court Jurisdiction"[4] was relied upon by the Illinois legislature to extend juvenile court jurisdiction to age 18.

This commission found that 17 year olds are more prone to risky behavior, less able to regulate emotions, less able to engage in moral reasoning, and less able to consider long term consequences of their actions.[5] If further found that the biological properties of adolescent brains were demonstratively less developed than those of adult brains "…17 year olds are physically unable to make the same type of reasoned and responsible decisions we expect of adults."[6] These conclusions were based on research examining high resolution images of 17

---

[3] The age change for adult jurisdiction was not made retroactive. While certain offenses committed by juveniles in Illinois are subject to automatic adult jurisdiction, attempt first degree murder is not one of them. *See*, 705 ILCS 405/5-130. The State of Illinois may petition a court to transfer jurisdiction to adult jurisdiction only after a hearing where court found certain requirements were met for mandatory, presumptive, or discretionary transfers to adult jurisdiction. Based on discussions with attorneys who have represented juveniles in the transfer hearings, Mr. Montes would have had a strong defense to contest a transfer in the event the state had moved for a transfer to the adult system. *See*, 705 ILSC 405/5-805.
[4] http://ijjc.illinois.gov/sites/ijjc.illinois.gov/files/assets/IJJC%20-%20Raising%20the%20Age%20Report.pdf
[5] *Id*, p.17.
[6] *Id*, p. 19.

year old brains versus those of adult brains. Further, the U.S. Supreme Court concluded that because of the fundamental differences in brain development, youths under 18 are categorically not as culpable as adults. *Graham v. Florida*, 130 S.Ct. 2011, 2025-2026 (2010). See also, *Roper v. Simmons*, 543 U.S. 551, 599 (2005) (juveniles brains are less developed, less mature and therefore less responsible than adults).

It is important to note that outside this prior conviction at age 17, and since his release from custodial portion of that sentence in August, 2009, Mr. Montes has no prior convictions for acts of violence (PSR, p. 18-20).

While the criminal history points and conviction here are properly counted, the reasons for change in 2014 to not include 17 year olds in adult jurisdiction apply equally to offenses committed by 17 year old brains prior to the change in Illinois law effective January, 2014. Under 18 USC 3553(a)(1), the three criminal history points applied by the guidelines overstate Mr. Montes culpability for his 2002 act. If this had been treated by Illinois as a juvenile matter in 2002, the offense would merit no criminal history points pursuant to USSG § 4A1.2 (d)(2) as he was released from confinement over five years prior to the commission of these offenses.

Based on the changes in Illinois law applying to both convictions discussed above, it respectfully submitted that Mr. Montes criminal history score should be reduced by 4 criminal history points, yielding a total of 2 criminal history points yielding a criminal history category of II.

### C. The Advisory Guideline Range.

The defense is cognoscente of the court's ruling in the codefendant's cases on guideline objections related to the extortion offense. Mr. Montes joins in the objection that the extortion demand was proven by a preponderance of the evidence to by above $95,000 resulting in a two level enhancement pursuant to USSG § 2B3.2 (b)(2) and § 2B3.1(b)(7)(C), (PSR, § 34).

Assuming the court ruling on this objection is overruled, the defense agrees with the final offense level calculations for the extortion offense and the stipulated conduct offense as outlined in the PSR (PSR, p. 11-14). It agrees the advisory total offense level is 26 for both offenses (PSR, § 26).

As argued above, it is the defense position that Mr. Montes's criminal history category is more appropriately in category II. Therefore it is the defense positon that the final advisory guideline range for Mr. Montes is 70 to 87 months.

### II. The 18 USC § 3553(a) Sentencing Factors.

### A. The History and Characteristics of Tirso Montes

A social history of Mr. Montes is attached to this memorandum as Exhibit A. This history provides the court with greater detail as to the factors that created the background for his involvement in these offenses and factors for the court to consider in assessing his likelihood in committing future offense and the type of punishment to impose based on the goals of sentencing as mandated by 18 U.S.C. § 3553(a)(2).

One of the primary causes of Mr. Montes succumbing to the sway of neighborhood gang culture was the immense impact that the death of his step father (who he loved like a real father) had on him when he was only 9 years old. It was a significant traumatic event to loose

such a loving, caring and positive role model. The family could no longer afford to live in the Roscoe Village neighborhood of Chicago and was forced to move to a then gang dominated neighborhood within Bucktown.

Young Tirso was lost and depressed from his "fathers" death. His mother had to work long shifts providing little parental care for Tirso. The neighborhood had significant gang activity. As his mother noted, Tirso biggest weakness was easily influenced by others particularly his older cousins that were involved in gangs.

As detailed in exhibit A, Tirso does have qualities that indicate (fortified through supervised release conditions to address his mental health issues, vocational training, and education on decision making) Mr. Montes could be a productive member of society in the future. He has strong commitment to his children and raising them in a positive manner. His mother notes that Tirso is very skillful at work with his hands. He wants to use his time in prison to not only accept his punishment but to do whatever he can to better himself through education and training programs that may offered to him. He is taking classes while at the MCC on budgeting and commercial truck driving. He has identified that most importantly he must surround himself with people that are positive influences that, like his "father," want the best for him.

### B. The Nature and Circumstances and Tirso Montes's Role in the Extortion Offense.

Tirso Montes was not leader of the extortion plan. He was not an active participant in the negotiations of the ransom demand. Indeed, Mr. Montes voice is only heard on a portion of one call made to Individual B.

6

While Mr. Montes is aware that the court has already determined that the two level enhancement has been established by a preponderance of the evidence for a demand amount over $ 95,000 pursuant to USSG § 2B3.2(b)(2), it is important to note that was an unrealistic starting point and demand. The more realistic and serious negotiations were for amounts approximately at $44,000 and whatever unspecified amount of drugs Individual B could muster up. While the court has determined the application of this guideline applies, the defense suggests that for 3553 purposes, the demand was merely a an initial negotiation starting point that was not expected to be realistically accepted by Individual B and therefore results in a greater than necessary assessment of the seriousness of the offense.

### C. The Nature and Circumstances of the stipulated offense for possession of firearms in violation of 18 USC § 922(g)(1).

Tirso Montes agrees with the government's version of the conduct related to this offense. The conduct underlying his prior conviction in 2002 for attempted murder by pointing a firearm without firing occurred when he was 17 years old. Under the guidelines Mr. Montes agrees that counts as a felony conviction making him a prohibited person who committed a crime of violence. Mr. Montes agrees for guideline purposes with the guideline calculations as outlined by the PSR.

However, it is worth noting for 18 U.S.C. § 3553(a)(1) purposes, that the same exact offense by a 17 year old committed after January 1, 2014 in Illinois would have been subject to juvenile jurisdiction. As discussed above, Illinois on that date, increased juvenile delinquency jurisdiction to include 17 year olds. Today that same behavior would have a realistic likelihood that resulted in a delinquency finding and not an adult criminal conviction under Illinois law.

7

For purposes of 3553 consideration, it is worth noting that had the change been made retroactive, and the prior felony conviction was resolved in juvenile court with a finding of delinquency, the guidelines would not have counted that delinquency finding as discussed above. Therefore, his base offense level would be two levels lower as the prior delinquency finding would not have constituted a guidelines countable prior criminal conviction for a crime of violence. USSG § 2K2.1(a)(4)(B) would apply resulting in a base offense level of 20 as opposed to 22. This would not change the final offense level due to the multiple count rules correctly discussed in the PSR (PSR, § 48).

However, in attempting to arrive at a reasonable sentence under 3553 for both offenses, the same behavior committed by a 17 year old after January 1, 2014 could have resulted in a finding of delinquency and thus not constitute a prior felony conviction, it is respectfully suggested that reducing the final offense level by two levels to 24 yields a reasonable sentence to meet the goals of sentencing. With a criminal history category of II, this would yield a range of 57 to 71 months.

### D. Sentencing Recommendation Pursuant to 18 USC § 3553(a)(2).

Based on the mitigation present in Mr. Montes's personal history, his commitment to changing his behavior, circumstances of the conduct, and his criminal history, it is respectfully suggested a that a sentence within the middle of a range of 57 to 71 months would be sufficient, but not greater than necessary to meet the goals of sentencing required by 18 USC § 3553(a)(2).

**III.    Objections to Proposed Conditions of Supervised Release**.

Mr. Montes has one objection to the proposed conditions of supervised release. Discretionary condition 16 permitting the probation officer to visit his place of employment. Employment can be verified through employment records.  Mr. Montes is concerned that his employment could be at risk if the probation officer visits him at his work site.  The provision that permits the probation officer to visit the defendant at "other reasonable location specified by probation officer" can include an area near but not at Mr. Montes's work site.

Respectfully Submitted,

FEDERAL DEFENDER PROGRAM
John F. Murphy,
Executive Director

By:    s/ *Piyush Chandra*
         Piyush Chandra
         Attorney for Tirso Montes

PIYUSH CHANDRA
FEDERAL DEFENDER PROGRAM
55 East Monroe St., Suite 2800
Chicago, IL 60603
(312) 621-8337

9

### CERTIFICATE OF SERVICE

The undersigned, <u>Piyush Chandra</u>, an attorney with the Federal Defender Program hereby certifies that in accordance with FED.R.CRIM. P. 49, FED. R. CIV. P5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document(s):

### SENTENCING MEMORANDUM

was served pursuant to the district courts ECF system as to ECF filings, if any, and were sent by first-class mail/hand delivery on <u>August 9, 2019</u>, to counsel/parties that are non-ECF filers.

> Laura O'Connor
> U.S. Probation Officer
> United States Probation Office
> 230 S. Dearborn St., Suite 3400
> Chicago, IL 60604

> By: */s/ Piyush Chandra*
> Piyush Chandra
> FEDERAL DEFENDER PROGRAM
> 55 E. Monroe St., Suite 2800
> Chicago, Illinois 60603
> (312) 621-8300

10

# Exhibit A

# Tirso Montes Social History

**Tirso Montes**
**Social History**

My name is Kate Van Winkle and I am a second year graduate student at the Jane Addams College of Social work at the University of Illinois at Chicago. I began working as a mitigation intern at the Federal Defender Program in May of 2019 under the direction of Federal Defender Program Mitigation Specialist Marcos Barbery. The information contained in this report is based on the Presentence Investigation Report, two in-person interviews with Mr. Montes at the Metropolitan Correctional Center, as well as, interviews with his mother, Luz Rivera, his older sister, Melissa Yrian and his fiancée, Betsy Valdivia. It also contains research conducted on issues impacting Mr. Montes' childhood and his cognitive, emotional and social development.

## <u>Childhood</u>

Tirso Ramon Montes Jr. was born in Chicago in 1984. He is the only child of his parents, Tirso Ramon Montes and Luz Rivera. His parents were not married at the time of his birth and his father left when Tirso was still an infant. Tirso has two older sisters, Melissa Yrian, who is 42 and Maribel Rosario, who is 40. He and his sisters all have different fathers. But unlike Tirso, his sisters' fathers were involved in their lives.

Tirso's mother says he was a healthy and happy baby. When Tirso was just under two years old, his mother began dating and became engaged to Jarlin Lugo. In his mother's words, "Mr. Lugo was the man in Tirso's life." To say he helped to raise Tirso is an understatement. Ms. Rivera says the two were never apart, Mr. Lugo even toilet trained Tirso. Without any connection to his biological father, Tirso considers Mr. Lugo to be his father. Tirso remembers Mr. Lugo as very loving and caring. He said Mr. Lugo introduced him to every sport imaginable, they would go everywhere together and barely spent a moment apart. Mr. Lugo's family embraced Tirso as their own, and to this day, Tirso considers them part of his extended family.

Tirso lived with his mother, sisters and Mr. Lugo in Roscoe Village. Mr. Lugo had 3 daughters from a previous relationship and the girls would split time between their father's house and their mother's house. Tirso attended what was then known as Pulaski Academy and remembers having a regular childhood. Tirso's mom worked in retail and Mr. Lugo installed windows. Tirso remembers both his Mom and his step-father working a lot and struggling, but generally being happy.

Everything changed for Tirso when he was 9 and Mr. Lugo died. Mr. Lugo died from AIDS related complications. Tirso said he still remembers the day his step-father collapsed at home and started having seizures and foaming at the mouth. In Tirso's memory, Mr. Lugo was taken to the hospital and never came home. His mother confirmed that Mr. Lugo did die at the hospital, but a few months after he collapsed. She said they did not let the children in his hospital room to see him after he died. She didn't want them to remember him like that. She remembers telling Tirso he was gone and he asked her "Why did God take my father?" Heartbroken, she told him God needed another angel. Tirso was not told that his step-father was sick, his death came as a complete shock.

Research has found the level of distress a child who loses a parent experiences is correlated to the openness of communication about that parent's death. Children whose surviving parent is open about the

loss and talks about it, particularly if there is an illness involved, have lower levels of distress.[1] The same research found that a parent's sudden death makes it even more difficult for a child to cope with the loss.[2] Further, it was found that a lack of openness can result in a child acting out as a result of the unresolved grief and trauma.[3] This is exactly what happened to Tirso. Though well-intentioned, he was kept in the dark about his step-father's illness and as a result his death was sudden and jarring. Even after he died, information about the cause of his death was not shared until years later. The circumstances around the death of Tirso's step-father provide insight into his reactions and subsequent behavior.

Tirso said the loss was devastating for everyone. Everything changed for the family. He, his mom and his sisters moved out and his step-sisters lived full-time with their mother. Tirso thinks his mom moved them because she knew he didn't want to go back to the apartment where he witnessed his step-father's collapse. He didn't want to constantly relive the memories. The family moved to Bucktown. His mother became a single parent. Tirso remembers his mother working all of the time to support the family. It marked a turning point in his life. He started to withdraw emotionally, he became angry and began acting out.

Tirso remembers having to cope and deal with the loss on his own because his mother was so busy. He was depressed and felt lost. Because their mother was working so much, Tirso remembers his sisters stepping in to help raise him. Not only were they dealing with loss, and the changes taking place in their own lives, but they were expected to take care of Tirso as well.

His oldest sister Melissa has a slightly different perspective on this time period. She too remembers everything falling apart after their step-father's death. Melissa was responsible for everyone, ensuring they got up in the morning, had breakfast, made it to school, made it home, did their homework and had dinner. She remembers having to spend her own money to ensure they all had enough to eat. She said she would get the child support directly from her father and that was the money she would use to take care of everyone. At a time of great upheaval, Tirso and his sisters were left to their own devices, not only to cope with the loss, but also to meet their basic needs. This behavior amounts to parental neglect and research has shown that neglect can impact a child's cognitive development and performance in school.[4] Additionally, it can be an indicator of future delinquency and a likelihood to engage in criminal activity.[5]

By all accounts, Tirso changed significantly after his step-father's death. Tirso says he stopped listening to all adults, he didn't trust anyone and he always had his guard up. After so much loss, he says he was afraid to let anyone get close for fear that they would leave or be taken away. Tirso never loved school, but before his step-father's death he was able to focus enough to make it through the day. But after his step-father's death, Tirso's anger started impacting his education. He started lashing out at teachers and fighting with his classmates. He was getting in trouble so frequently, his mother asked that he be tested. He was diagnosed as having a behavioral disorder, specifically Attention Deficit Disorder. He was

[1] Raveis, V. H., Siegel, K., & Karus, D. (1999). Children's Psychological Distress Following the Death of a Parent. *Journal of Youth and Adolescence, 28*(2), 165-180. doi:10.1023/a:1021697230387
[2] *Ibid.*
[3] *Ibid.*
[4] Mills, R., Kisely, S., Alati, R., Strathearn, L., & Najman, J. M. (2019). Cognitive and educational outcomes of maltreated and non-maltreated youth: A birth cohort study. Australian & New Zealand Journal of Psychiatry, 53(3), 248–255. https://doi.org/10.1177/0004867418768432
[5] Ryan, J. P., Williams, A. B., & Courtney, M. E. (2013). Adolescent Neglect, Juvenile Delinquency and the Risk of Recidivism. *Journal of Youth and Adolescence, 42*(3), 454-465. doi:10.1007/s10964-013-9906-8 and Widom, C. S. (1989). Child Abuse, Neglect, And Violent Criminal Behavior*. *Criminology, 27*(2), 251-271. doi:10.1111/j.1745-9125.1989.tb01032.x

prescribed Ritalin. The Ritalin made him calmer, quieter and better able to pay attention and focus. While the changes made his teachers happy, he didn't like it. The medicine made him feel like a different person. He lost his appetite and he had constant headaches. His mom confirmed that the medicine changed him, but she thought the impact was significantly positive. He was able to slow down and focus, but it wasn't long before he refused to take it and his old behaviors returned. During this time he also went to see a therapist twice a week. He said he would open up a little bit, but he still didn't trust anyone. He wasn't able to really let the therapist in to help him deal with his feelings.

Tirso suffered not only the loss of his beloved step-father, but he also lived with the reality and stigma that his biological father was never part of his life. Research has found that abandonment by a father can lead to feelings of shame and stigmatization for boys.[6] They can develop a sense that there is something about them that leads people to abandon them.[7] This experience and these feelings can leave boys questioning the stability and durability of all relationships, making it difficult for them to trust people.[8] Further, the shame boys experience can act as a disincentive for the exploration and expression of emotion, leaving them ill-equipped and disinclined to address their feelings of loss.[9] The loss of the man he did considered his father compounded and highlighted the earlier abandonment by his biological father. It has been found that children who lose an attachment figure early in their lives can suffer from depression, an increase in anxiety around potential additional loses, and they can suffer angry outbursts and regression in development and behavior.[10] Tirso's responses to the losses he suffered all fall within what the research says is normal for young boys who suffer the loss and death of a parent. He was angry, he acted out and he shut down emotionally.

Tirso's mother and sister both point to this period as the time he started hanging around the wrong crowd. His mother recalls opening the door once they had moved to their new neighborhood to find a group of young boys asking to see Tirso. She told them he wasn't there and they asked her to let Tirso know that they stopped by and that he "owed his dues." His mother tried to tell them Tirso didn't owe them anything, but she said that is when she knew he was hanging out with a bad crowd.

Tirso also acknowledges this is when he really started to get into trouble. He says he began hanging out with the older guys in the neighborhood, many of whom were his older cousins. Unfortunately, they were all gang affiliated. Hungry for a male role model, Tirso became enamored of the older guys and did whatever he could to fit in. He said his cousins told him they had his back and he remembers always seeking their approval. Both his Mom and his sister say one of Tirso's biggest weaknesses was that he was too easily influenced by other people. Looking back, Tirso realizes he was looking for a father figure and turned to his older cousins to fill that role. Tirso's path to gang activity is a familiar one, research shows young people become gang involved for a number of reasons including all the things that drew Tirso; involvement of other family members, geographic proximity and to fill an emotional or familial void.[11]

---

[6] Balcom, D. A. (1998). Absent Fathers: Effects on Abandoned Sons. *The Journal of Men's Studies, 6*(3), 283-296. doi:10.1177/106082659800600302

[7] *Ibid.*

[8] *Ibid.*

[9] *Ibid.*

[10] Dowdney, L. (2000). Annotation: Childhood Bereavement Following Parental Death. *Journal of Child Psychology and Psychiatry, 41*(7), 819-830. doi:10.1017/s0021963099006216

[11] Lachman, P., Roman, C. G., & Cahill, M. (2012). Assessing Youth Motivations for Joining a Peer Group as Risk Factors for Delinquent and Gang Behavior. *Youth Violence and Juvenile Justice, 11*(3), 212-229.

3

He officially got "jumped in" the gang when he was 11 and they became his new family. Soon after that he started getting in trouble regularly. From 11 to 17, he had frequent run-ins with the law. Tirso says at the time he felt like the gang life was all he had.

## Adolescence

Once Tirso hit high school, he rarely attended class. He would go to homeroom for attendance and then leave campus. He dropped out his freshman year. While he had his first drink at 11, he only occasionally drank. He preferred smoking marijuana, which he did on a daily basis. He said it helped him relax and worry less, it was his way of coping. There was no focusing on the future, he and his friends only thought about the present.

Starting around age 13 he started getting picked up by the police all of the time. His was first convicted in juvenile court at 13 and continued to have arrests and convictions for possession, trespass and disorderly conduct. His mother tearfully remembers Tirso being out of her reach during this time. She said the police would frequently pick him up and bring him home, but he would just head right back out to the streets. When he had a court date, she would go, but he wouldn't show up. She felt like she was losing him.

His mother remembers the night in 2002 when things got even worse. She remembers that he called to check on her. It was unlike him to call and that worried her. She asked where he was and offered to go pick him up, but he brushed her off. He said he was fine and that he would be home later. He got home very late that night and she remembers his shirt being filthy and him having a terrified look in his eyes. She asked what was wrong, but he just said he was going to bed. The next day he told her he had been chased and had to hide under the car. Later that day the police came to arrest him for attempted murder. In his account, he had been running from and pointed a gun at someone who was actually a police officer.

Tirso pled guilty to attempted first degree murder and spent 6 years in prison. Around the mid-point of his sentence, he decided to use his remaining time to improve his life. Being in classes studying for his GED helped focus him and put him in contact with positive people who were interested in helping him succeed. He said several "old timers" would give him advice and help steer him in the right direction. He focused on his education, he worked out regularly and he ultimately earned his GED.

## Early Adulthood

He was released on his 23rd birthday. He knew that he was going to have to find work right away and he prepared himself to take whatever work was available. While he went to school in prison, he did not focus on a specific career or receive specific job training skills. He had no idea what he was going to do once he got out. He was 23, had no job history and a felony on his record.

Once out he had a series of relationships and began to have kids. He is the father of 3, two girls and one boy. He is very devoted to his kids. His mother says he transforms when he is with his children and that even his nieces and nephews adore him. From an early age he was been great with kids and that has only deepened since he has had his own. Early on in his oldest daughter's life, he noticed a troubling pattern with her mother. When he did not do what she wanted, she would withhold access to their daughter. Not wanting anything to jeopardize his relationship with his daughter, he went to court to establish paternity, set up child support and secure regular visitation. His mother said it was slow going at first, he would only get to see her a few hours on the weekends, but he stuck to it. He showed the judge, his daughter and his ex-girlfriend that he was serious and committed to being a good parent. He eventually secured visitation on every other weekend and one night a week. Tirso has an almost two-year old son whom he is crazy about. He is engaged to his son's mother. Unfortunately, his relationship with the mother of his

4

middle child is so toxic that he has had very limited contact with his youngest daughter throughout her life. He hopes to change that once he gets out.

Tirso has had some struggles since he was released in 2007. In 2009, his grandmother, whom he loved dearly, passed away. And as was his pattern when dealing with loss, he shut down. He was in the middle of an HVAC training program and just stopped going because everything felt hopeless. But, he kept trying and he kept looking for work. Before his most recent arrest, Tirso had settled down with his fiancée and they were raising their son and her two daughters from another relationship. He was able to see his oldest daughter regularly and enjoy time with his mother and his sisters. But Tirso started to get frustrated by his lack of steady employment and he started hanging out with the wrong people again. This was a new group of guys, most of his old friends either died or got out of the life. This new group were older, but still up to no good. Unable to resist the pull of his friends and his increasing anxiety about how to support his growing family, Tirso fell into his old patterns. Both his mother and his sister think it was the same old pattern of Tirso listening to the wrong people. It seems that Tirso finally understands that too.

## Today

Tirso is adamant about changing his life. He knows he needs to pay for what he did and he wants to make sure to spend his time in prison bettering himself. He hates that he is doing to his kids what he suffered through. He did not want them to have to grow up without him. He wants to be better for them. He wants to be there for them and to be able to support them.

Tirso has outgrown his youthful anger and rage, but he still has not fully dealt with the trauma of his childhood. The echoes of that and the coping mechanisms he developed to get by as a child remain and they continue to haunt him and lead him down the wrong path. He needs help to address these issues. His mother hopes he is able to receive counseling while he is incarcerated, she thinks that will help him learn to deal with his frustration and his tendency to listen to the wrong people. Both she and his fiancée think Tirso still has ADHD and they think if he could once again receive treatment for that it would really help.

Tirso says he is handy and he is interested in learning a trade or craft during his incarceration. During the time he has been in the MCC, he has been taking classes on budgeting and courses to receive his commercial driver's license. He also continues to exercise, he takes a "full body workout" class taught by a fellow inmate.

The idea of his children growing up without him motivates him to do better. He created a list of his long term goals with smaller, intermediary steps necessary to meet each larger goal. Every day he reviews the list to determine what he has done to help him meet his goals. He has a focus and a determination that he has not had before. Once released, he plans to live with his mother, get a job and get his life back on track. He hopes to have gained a trade or other job skill while incarcerated that will help him secure gainful, long-term employment. His mother also says he is good with his hands and thinks with the right training program he will be on the right track once he is released. His fiancée is hopeful about the future, but recognizes he needs a really solid plan once he gets out. She wants the best for him, but she is not willing to put up with anymore nonsense.

Tirso says he wants to surround himself with positive people, those who want the best for him. He says this life is not for him, he wants to serve his time, use it wisely and get back to his family.

Respectfully submitted,


Kate Van Winkle, JD
Mitigation Intern

Federal Defender Program
55 E Monroe St., Ste 2800
Chicago, IL 60603

# Exhibit B

## Reference Letters

July 14, 2019

To Whom It May Concern,

      My name is Maribel Rosario and I am the sister of Tirso R. Montes Jr, I am writing this letter just to give a little insight on who Tirso is to me as a person. Tirso is my baby brother, and since he was a baby his biological father was not in his life. It wasn't until he was 1 yrs old and our mother met a man who would become the father figure a boy would need in his life. As a child, Tirso was a very sweet and loving boy. He was also very curious and had a determination to never give up. Tirso was very athletic and had such a passion for basketball, and he was very good at it. He was shorter than most basketball players, but he never let his height stop him from the game he loved so much.

      Around the age of 7 or 8, the man that raised him, the only father he knew, passed away, and that left Tirso so heartbroken and devastated. It began to affect him in his school work and his desire to play ball. It wasn't until I became a mother at a young age and made Tirso an uncle, which was around 9 or 10 yrs old for him, that Tirso began to feel happy again. Having a new baby in the family gave him a sense of purpose and he became the sweet loving boy I once knew. He was so sweet with his niece and very attentive to her, always helping me in any way he can. Out of everyone in the family, he was the only one who could make her laugh so hard by singing a song he made up for her, and even til this day that she is now 25 yrs old, he still makes her smile and laugh when he sings it to her. He now has children of his own and I can see how great he is with his children as he is with my children.

      Tirso has made mistakes against his better judgment and has had a few bumps along the way, but he is still the loving, caring, and supportive boy, now a man, that we all know and love and would do anything for his family that he can. My family and I are hoping that you will take this into consideration when determining his fate, and we will be here to continue to love and support him to the best of our ability and help guide him on the right path. Thank you for your time and consideration.

Sincerely,

*Maribel Rosario*

Maribel Rosario

July 16, 2019

Good day you're Honor

My name is Luz E. Rivera I am the mother of Tirso R. Montes Jr. I am writing this letter so you may know a little more of whom Tirso is. He is my youngest child and my only boy; he has never had his biological father in his life. He has two older sisters Melissa and Maribel who he loves and respects. As a child he was very active and loved to play. I met Mr. Lugo when he was 1yr old and he became the father figure that he needed. They had such a strong bond that they did everything together playing ball, learning to ride a bike, playing in the park, camping, swimming of which he learned at the young age of 3. Unfortunately Mr. Lugo passed away when Tirso was around 8 years old and that's when his life changed. He was no longer my happy active child.

I made a decision to move to a different school area and that is when Tirso learned to play basket ball. There still were times when he would be sad, but thanks to the athletics' teacher at the new school who encouraged him and would coach him; he was able to get thru his sadness. He has always been very determined when it came to the one sport he loves still to this day. He won numerous trophies that I have kept still to this day as reminders of my happy loving child.

Tirso has struggled in life, but has never given up. He enrolled in a trade school to better himself and provide for his family. The one thing I can say is that his love for his children Natalia and Ethan and all of his nephews and his only niece is special. They all miss and love him so much. He has a family that loves and supports him and will continue to help him move forward.

My son is a loving and kind person, and those are the same morals he has taught his daughter Natalia who tells him everything is going to be ok. He has made some wrong decisions, and with the support from his family we plan to get him back on the right path. There is more I can say of how he has helped me and his family but I will end this letter here. You're Honor, I as his mother thank you for taking the time to read this letter before making your final decision.

Sincerely,

*Luz E. Rivera*

Luz E. Rivera

July 18, 2019

Inmate: 52196424- MONTES, TIRSO

Good afternoon Your Honor,

My name is Melissa Urian and I am the eldest sister of Tirso R. Montes Jr. I'd like to share with you, and the members of this courtroom, a little bit about my brother.

Tirso is the youngest of my mother's three children and the only boy. Growing up, he was a very active little guy who loved to ride bikes, perform stunts and play with Hot Wheel cars. In elementary school he spent quite some time at our local park district where he loved to play basketball. The athletic department personnel grew very fond of him and would allow him to spend time on the court and play a few games after school. He even earned a few medals and trophies I might add. He was also quite an artist and would often hang his intricate artwork on the walls of his bedroom. Tirso was always finding things to do and stay busy including his weekly visit to the Youth Outreach Center on Irving Park Road in Chicago.

One special memory I have of my brother was when I was going through my divorce and thinking to myself, "how I am going to do this alone- work and raise my toddler son", Tirso had an answer. He said to me "sister don't worry, I'm here to help you now, I got you!" And that he did. He helped tidy up our apartment in which we shared, made meals if needed and spent time with my son so that I could work the two jobs I had at the time. In between helping me, he was also busy getting himself together too. He occasionally worked for a temping agency, attended an HVAC program and was also co-parenting an infant daughter of his own. Thus far, it has been heartwarming having my brother around and watching him interact with his own children and ours, given the circumstance of having an absent father himself.

Your Honor, my brother Tirso overall is a giving and kind hearted person who means well. With the continued love and support from our friends and family, we are hoping that you will take this into consideration when making your final decision today. Thank you for your time.

Sincerely,


Melissa Urian